IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FREDERICK WARREN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 21-CV-575-MAB |
| | ) |
| ETHAN MCQUEEN, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on Defendant Ethan McQueen's motion for summary judgment (Doc. 33). For the reasons set forth below, the motion is granted.

### BACKGROUND

Plaintiff Frederick Warren, an inmate in the Illinois Department of Corrections, filed this lawsuit pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Lawrence Correctional Center (Doc. 1; Doc. 6). Specifically, Plaintiff alleged that Sergeant Ethan McQueen used excessive force to unnecessarily restrain him during the evening medication distribution on November 14, 2019 (Doc. 6). Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A, the Court permitted Plaintiff to proceed on an Eighth Amendment claim against Sergeant McQueen for excessive force (Doc. 6).

Defendant McQueen filed a motion for summary judgment on August 8, 2022, arguing that his use of force against Plaintiff did not violate the Eighth Amendment (Doc. 34, p. 5). Plaintiff filed a response in opposition to the motion for summary judgment (Doc. 39).

## FACTS

The following is Plaintiff's version of events, which Defendant does not dispute, except when noted. On the evening of November 14, 2019, Plaintiff was let out of his cell to go to the window in the cellhouse foyer where a nurse was passing out medications (Doc. 34-1, p. 8). There were approximately four or five other inmates also in the medication line (*Id.* at p. 13–14). Sergeant Ethan McQueen was in the foyer monitoring the medication line (*Id.* at pp. 16, 17). There was also another officer "in the bubble," which Plaintiff described as a locked room with windows, whose job was to "monitor what's going on around them" (*Id.*; *see also* Doc. 34-2, p. 8 (incident report from officer assigned to the "control pod")).

According to Plaintiff, when he approached the window and was given his medications, he noticed that several were missing, including his prescribed pain medication (*Id.* at pp. 8–9). He told the nurse and was trying to explain the issue, but Sergeant McQueen was "trying to rush the line" (*Id.* at pp. 8, 9). Plaintiff responded to McQueen, essentially telling McQueen that he needed to finish talking to the nurse (*Id.* at p. 9) ("I turned around to explain to McQueen that my medication is not there . . . He wasn't trying to hear it. . . . I told him that his job was security. Let me continue to explain to the nurse about my medication that's not given."). Plaintiff and the nurse continued

going back and forth, (*see id.*), and once she checked his medications, she agreed that some were missing (*Id.*). At the same time, McQueen approached Plaintiff and told him to leave the medication window (*Id.*). Plaintiff had his medication but was still trying to figure out when the nurse was going to bring him the missing ones (*Id.*). As the nurse told him she would bring them later, Plaintiff "kept asking her why did you lie to me in the first place?" (*Id.* at pp. 9–10). McQueen told Plaintiff, "Man, that's enough of that" (*Id.*). Plaintiff started talking back to McQueen and admitted "I refuse[d] a direct order that he gave me concerning my medication" (*Id.* at p. 10). Plaintiff said he continued to plead his case to both Sergeant McQueen and the nurse, and each time he turned around to talk to the nurse, McQueen got "louder and louder" (*Id.* at p. 10). Plaintiff said McQueen began to approach him and Plaintiff continued to refuse McQueen's orders and asked to speak to a lieutenant (*Id.* at pp. 10–11) ("As he approached me telling me this and this and this, so I say, Man, I refuse because I know this nurse is lying to me."). McQueen said he was not going to call a lieutenant and grabbed Plaintiff, which left Plaintiff "shocked, confused" (*Id.* at p. 11).

Plaintiff testified that McQueen "tried to manhandle me, but it wasn't working due to I know what he was doing before he did it. So he got more aggressive, tried different wrastling physical techniques to subdue me to the floor." (*see* Doc. 34-1, p. 11). Plaintiff claims that Sergeant McQueen threw him to the floor and put a knee in his back, which Plaintiff testified was very painful because he has arthritis in his shoulder (*Id.* at

pp. 11–12).¹ Plaintiff said the more he told McQueen about his injured shoulder, the more McQueen focused on that to cause Plaintiff more pain (*Id.*). Plaintiff said his shin was also injured (*Id.* at p. 17). Other officers came to assist Sergeant McQueen and Plaintiff was escorted back to the wing (Doc. 34-1, pp. 13–14).

The incident reports filled out by Sergeant McQueen and other officers as well as the nurse tell essentially the same story. The reports indicate that Plaintiff was "upset" that some of his medications were missing and became "beligerant [sic] and unruly"

---

¹ Plaintiff did not mention any choking or kicking when describing the incident during his deposition (*see* Doc. 34-1). However, in the complaint, Plaintiff alleged that Sergeant McQueen grabbed him by the neck, choked him, and kicked him in the left shin (Doc. 1, p. 23). Plaintiff likewise claimed in his response in opposition to the motion for summary judgment that McQueen choked him (Doc. 39, p. 5). The statements in the complaint are not admissible for summary judgment purposes because Plaintiff did not declare them to be true under penalty of perjury or swear them to be true in front of a notary (*see* Doc. 1, p. 23). *See James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020) (only a "verified complaint—signed, sworn, and submitted under penalty of perjury" can be considered the equivalent of an affidavit and used as evidence at summary judgment). *See also Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985) (a sworn affidavit "is a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath{,}" like a notary); 28 U.S.C. § 1746 (unsworn declaration can be used in place of a sworn affidavit so long as it declares "under penalty of perjury" that the content is "true and correct," or uses other language "substantially . . . [similar in] form");

Plaintiff's statements in his response to the motion for summary judgment are also not admissible for summary judgment purposes for the same reason (Doc. 39, pp. 2, 3, 6, 11). *See Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) ("verified" response to summary judgment declared to be true under penalty of perjury constitutes competent evidence). Plaintiff did not declare the contents of his response brief to be true under penalty of perjury (*see* Doc. 39). And while the response brief contains a notary's signature and seal, there is no indication whatsoever that the notary administered an oath to Plaintiff or that Plaintiff swore the contents as true before the notary (*see* Doc. 39, pp. 2, 3, 6, 11). *See Network Computing Servs. Corp. v. Cisco Sys., Inc.*, 152 F. App'x 317, 321 (4th Cir. 2005) (document with notarized signature did not amount to an unsworn declaration under 28 U.S.C. § 1746 because "[t]he notary's certificate simply means that the [witness's] signature is authentic. It is not a substitute for language indicating that the witness understood he risked prosecution for perjury if he gave false testimony."); *Latney v. Parker*, No. 2:17CV24, 2017 WL 7794573, at *3 (E.D. Va. July 20, 2017) (rejecting declarations submitted by plaintiff that were stamped by notary because declarants did not swear to their contents under penalty of perjury and there is no indication that the notary administered an oath to [them]"), *aff'd,* 707 F. App'x 202 (4th Cir. 2017); *McCoy v. Robinson*, No. 3:08CV555, 2010 WL 3735128, at *2 (E.D. Va. Sept. 22, 2010) (same); *McLorn v. Cmty. Health Servs.*, 456 F. Supp. 2d 991, 993 (S.D. Ill. 2006) (same). *See also Flowers v. Abex Corp.*, 580 F. Supp. 1230, 1233 (N.D. Ill. 1984) ("Merely notarizing the signature does not transform a letter into an affidavit."). *But see King v. Schieferdecker*, 498 F. App'x 576, 579 (7th Cir. 2012) (affirming affidavits were proper for summary judgment where "the affiants all state that before a notary they affirm and swear to the truth of their statements, which they make on personal knowledge.").

(Doc. 34-2, pp. 3, 4). The nurse advised that she would have to come back with the missing medications, at which point Plaintiff "became even more upset" (*Id.* at p. 4; *see also id.* at pp. 3, 8). Sergeant McQueen wrote that Plaintiff "became loud and argumentative" with the nurse and the nurse likewise said Plaintiff was "yelling and being verbally abusive" (*Id.* at pp. 5, 7; *see also id.* at p. 3). McQueen ordered Plaintiff multiple times to take his medications and go back to his cell but Plaintiff "ignored the direct orders and continued to yell at the nurse" (*Id.* at p. 7; *see also id.* at pp. 3, 4, 5, 8). McQueen then ordered Plaintiff to cuff up and stepped behind Plaintiff and put Plaintiff's right wrist in a mechanical restraint, but Plaintiff began struggling and trying to move away (*Id.* at p. 7; *see also id.* at pp. 3, 4, 5, 6, 8; Doc. 39, p. 15). McQueen said he "guided [Plaintiff] to the ground" and was assisted by another officer in securing Plaintiff in mechanical restraints (*Id.* at p. 7; *see also id.* at pp. 3, 4, 5, 6, 8). Plaintiff was kept on the floor until he agreed to be calmly moved to the wing (*Id.* at p. 7).

After Plaintiff was escorted back to the wing, a nurse came to evaluate him (Doc. 34-1, p. 18; *see also* Doc. 34-3, p. 1; Doc. 34-2, p. 2). A visual assessment of his shoulder did not reveal any dislocation, misalignment, bruising, or swelling (Doc. 34-2, p. 2). There was a "1 ½ [inch] very superficial" abrasion on his shin, but it "really [did] not look much different" than his other, uninjured shin (Doc. 34-3, pp. 1, 2). There was no bruising, bleeding, or swelling noted (Doc. 34-2, p. 2). Plaintiff said he was given ice and pain medication (Doc. 34-1, p. 20).

## DISCUSSION

Summary judgment is proper if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In deciding a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts . . . ." *Johnson v. Rimmer,* 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Rather, the court "must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

The Eighth Amendment, which prohibits "cruel and unusual punishments," has been interpreted to prohibit the "unnecessary and wanton infliction of pain" on prisoners in a correctional institution. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). In the context of a claim that a prison official used excessive force in violation of the Eighth Amendment, "'the core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Outlaw*, 259 F.3d at 837 (quoting *Hudson*, 503 U.S. at 7). *Accord McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). *See also Harper v. Albert*, 400 F.3d

1052, 1065 (7th Cir. 2005) ("[I]n order for a constitutional violation to exist, plaintiffs in a § 1983 action must establish that prison officials acted wantonly or . . . 'maliciously and sadistically for the very purpose of causing harm.' Indeed, 'negligence or even gross negligence is not enough . . . .'") (citations omitted); *James v. Milwaukee Cnty.*, 956 F.2d 696, 699 (7th Cir. 1992) ("[P]rison conditions involving the wanton and unnecessary infliction of pain, totally without penological justification, offend the constitution." (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981))).

This standard takes into account that matters of internal security at a prison are entitled to deference in general,[2] and this deference extends to the use of force in response to an actual prison disturbance as well as to preventative measures. *Whitley*, 475 U.S. at 321–22; *McCottrell*, 933 F.3d at 663.

> [O]fficials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Despite the weight of these competing concerns, corrections officials must make their decisions "in haste, under pressure, and frequently without the luxury of a second chance." We accordingly concluded in *Whitley* that application of the deliberate indifference standard is inappropriate when authorities use force to put down a prison disturbance. Instead, "the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 320).

---

[2] *Rhodes v. Chapman*, 452 U.S. 337, 350 n.14 (1981) ("[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators."); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

In determining the intent of the prison official who applied force, the court must examine a number of factors, including (1) the need for the application of force; (2) the amount of force that was used; (3) the extent of the injury the force caused to the inmate; (4) the extent of the threat reasonably perceived by the officer; and (5) any efforts made to temper the severity of the force used. *McCottrell*, 933 F.3d at 663 (citing *Whitley*, 475 U.S. at 321); *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022) (citation omitted). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *McCottrell*, 933 F.3d at 663 (quoting *Whitley*, 475 U.S. at 321).

In this instance, Defendant McQueen argues that he did not use excessive force against Plaintiff without penological justification and summary judgment is warranted because the record establishes:

> (1) [that there was] a need for force due to Plaintiff's non-compliance and argumentative behavior; (2) that the amount of force applied resulted in a minor, superficial injury; (3) that the threat Defendant perceived was reasonable, given that he was the only officer monitoring the medication call line of Plaintiff and four other inmates; (4) that Defendant made an effort to temper the use of force by giving Plaintiff direct orders to comply; and (5) that Plaintiff sustained a minor, superficial injury as a result of this incident.

(Doc. 34, p. 7). The Court agrees; no reasonable jury could conclude that McQueen used excessive force in restraining Plaintiff.

According to Plaintiff's own account of the situation, he was trying to talk to the nurse about his missing medications, and when Sergeant McQueen tried to get Plaintiff

moving, Plaintiff essentially told him to butt out (*see* Doc. 34-1, p. 9). And then Plaintiff went back to pleading/quarreling with the nurse about his medications and accusing her of lying. All the while, Sergeant McQueen shouted orders at him, getting louder and louder each time Plaintiff refused to comply. McQueen was dealing with an agitated, argumentative, and uncooperative prisoner in the presence of a handful of other inmates, who were all unrestrained, and he was the only correctional officer in the immediate vicinity. It was, without a doubt, a tense and potentially volatile situation that presented a threat to security and safety at the prison, and no reasonable jury could disagree. *See, e.g., Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 132 (1977) ("Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration.")

      Sergeant McQueen tried to handle the situation without using any force by giving Plaintiff a number of verbal orders, but Plaintiff was uncooperative. At that point, McQueen decided that Plaintiff needed to be restrained, which seems entirely reasonable. Plaintiff essentially admitted that he resisted McQueen's attempt to handcuff him (*see* Doc. 34-1, p. 11). In response, McQueen took Plaintiff to the ground to subdue and restrain him. There is no evidence McQueen snuck in any unnecessary blows, slammed Plaintiff's head on the ground, punched him, kicked him, or otherwise beat him. Rather, the evidence shows that McQueen appropriately increased his use of force due to Plaintiff's resistance and used only the amount of force necessary to handcuff Plaintiff. And Plaintiff suffered only a superficial abrasion and temporary pain.

Under these circumstances, a reasonable jury could only conclude that Sergeant McQueen's course of conduct evinces a good faith effort to restore order. The evidence in this case, viewed in a light most favorable to Plaintiff, simply does not support a reliable inference that McQueen used force maliciously and sadistically for the very purpose of causing Plaintiff harm. *See Hendrickson v. Cooper*, 589 F.3d 887, 891 (7th Cir. 2009) (acknowledging that "[taking inmate] to the concrete floor and knee[ing] him in the back" is "perhaps justified . . . to restrain a dangerous inmate"); *Carr v. Terrell*, 182 F.3d 921 (7th Cir. 1999) (holding that where prisoner's refusal to cuff up prompted guards to use physical force to extract him from his cell, but they did not beat or kick him, the guards "did not act maliciously and sadistically to cause harm, but acted in good faith to restore discipline."); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) ("Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest."); *Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994) (holding that where inmate refused to be reshackled and prison guards had to "struggle with [him] and forcefully reshackle him," but did not hit or beat him, the prison guards did not act with a malicious or sadistic intent to harm).

## CONCLUSION

For the foregoing reasons, Defendant Ethan McQueen's motion for summary judgment (Doc. 33) is **GRANTED**. Judgment is granted in his favor and this case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

IT IS SO ORDERED.

DATED: March 9, 2023

s/ Mark A. Beatty
MARK A. BEATTY
United States Magistrate Judge

## NOTICE

If Plaintiff wishes to contest the Order granting summary judgment to Defendant on the issue of exhaustion, he has two options. He can ask the Seventh Circuit to review the order, or he can first ask the undersigned to reconsider the Order before appealing to the Seventh Circuit.

If Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal *within 30 days* from the entry of judgment. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 425 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard).

On the other hand, if Plaintiff wants to start with the undersigned, he should file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). The motion *must* be filed within twenty-eight (28) days of the entry of judgment, and the deadline *cannot* be extended. FED. R. CIV. P. 59(e); 6(b)(2). The motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should

reconsider the judgment. *Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010); *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) ("To prevail on a Rule 59(e) motion to amend judgment, a party must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment.") (citation and internal quotation marks omitted).

So long as the Rule 59(e) motion is in proper form and submitted on-time, the 30-day clock for filing a notice of appeal will be stopped. FED. R. APP. P. 4(a)(4). The clock will start anew once the undersigned rules on the Rule 59(e) motion. FED. R. APP. P. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal; it will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 760–61 (7th Cir. 2001); *Martinez v. Trainor,* 556 F.2d 818, 819–20 (7th Cir. 1977). Again, the deadline for filing a notice of appeal can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.

The Court has one more bit of instruction regarding the appeals process. If Plaintiff chooses to appeal to the Seventh Circuit, he can do so by filing a notice of appeal in this Court. FED. R. APP. P. 3(a). The current cost of filing an appeal with the Seventh Circuit is $505.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison

trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C). If he is allowed to proceed IFP on appeal, he will be assessed an initial partial filing fee. 28 U.S.C. § 1915(b)(1). He will then be required to make monthly payments until the entire filing fee is paid. 28 U.S.C. § 1915(b)(2).